IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ANTHONY HALL,<br>　　Plaintiff, | )<br>)<br>)　Case No. 7:20-cv-00171<br>) |
| v. | )<br>) |
| | )　By: Hon. Michael F. Urbanski |
| DR. KYLE SMITH,<br>　　Defendant. | )　Chief United States District Judge<br>)<br>) |

## MEMORANDUM OPINION

Anthony Hall, a former Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983 against Dr. Kyle Smith. At the time the action was filed, Hall was incarcerated at Augusta Correctional Center ("ACC"), where Dr. Smith provides medical care and treatment to inmates. Hall claims that Dr. Smith violated his Eighth Amendment rights by failing to provide "prompt adequate medical care treatment" for a serious "scalp disease infection." Compl. 1, ECF No. 1-1. Dr. Smith has filed a motion for summary judgment to which Hall has responded. ECF Nos. 17 and 21. For the reasons set forth below, the motion for summary judgment is **GRANTED**.

### I. Background

#### A. Hall's Verified Complaint

In his verified complaint, filed on March 19, 2020, Hall claims that Dr. Smith delayed and deprived him of adequate treatment for his serious scalp condition for "over two years." Compl. 2. More specifically, Hall alleges that Dr. Smith failed to provide the course of treatment recommended by a plastic surgeon at the University of Virginia ("UVA") and instead "prescribed antibiotic medicine," which did not "provid[e] any significant change to

plaintiff's scalp condition." Id. at 3. He further alleges that his scalp is "constantly hurting," that he has experienced "skin irritation, swelling, loss of hair, bleeding and pus draining," and that the condition has spread to other areas of his body. Id. at 3–4. Hall asserts that the "[o]nly solution to the problem is corrective surgery." Id. at 4.

Hall also claims that Dr. Smith prevented him from being transferred to another correctional facility, where Hall believes he could have received "better medical care." Id. Hall alleges that a Department of Corrections ("DOC") official visited him at his cell on January 14, 2020, and examined his scalp condition. Id. According to Hall, the administrator confirmed that he should be transferred to a different "(DOC) medical facility," and Central Classification Services approved the transfer request in March of 2020.[1] Id. However, Dr. Smith stopped the transfer by "issuing a medical hold . . . allegedly due to offsite scheduled medical appointment pending." Id. Hall maintains that if the transfer had occurred as scheduled, he "could have now receive[d] the adequate medical treatment needed." Id.

### B. Dr. Smith's Evidence

In support of his motion for summary judgment, Dr. Smith has submitted his own affidavit and copies of Hall's medical records. The medical records reveal that Hall suffers from "severe dissecting cellulitis of the scalp" and that he has received treatment from numerous providers over the past few years for this condition and others, including Hepatitis C and prostate cancer. Med. R. 196, ECF No. 18-2; see also Smith Aff. ¶ 5, ECF No. 18-1.

---

[1] Hall does not identify the particular facility to which he sought to be transferred and, instead, merely references a "medical facility." Hall uses the same language in describing ACC. See Compl. 5 (alleging that Dr. Smith is a prison physician at "Augusta Corr. Center, Medical Facility" and that Hall has not received adequate medical treatment at "Augusta Correctional Center, Medical Facility").

2

Dr. Smith had not begun working at ACC when Hall first saw a dermatologist for his scalp condition on January 9, 2018. Smith Aff. ¶ 6. Pursuant to the dermatologist's recommendations, Dr. Landauer, a physician at ACC, prescribed doxycycline (an antibiotic) and clobetasol (a topical corticosteroid). Id. ¶ 6; Med. R. 27.

Hall returned for a follow-up appointment at Savola Aesthetic Dermatology Center on May 21, 2018, shortly before Dr. Smith began working at ACC. Smith Aff. ¶ 7; Med. R. 3–6. At that visit, the dermatologist, Dr. Savola, advised Hall that she was of the opinion that the most effective treatment option for his scalp condition would be Accutane or Humira injections. Med. R. 5. Dr. Savola also discussed the possibility of undergoing surgery for the scalp condition. Id. Because Hall was interested in the surgical treatment option, Dr. Savola agreed to contact a local surgeon regarding the procedure. Id. In the meantime, Dr. Savola directed Hall to continue using clobetasol as needed. Id.

On June 14, 2018, Dr. Savola advised ACC that she was referring Hall to Dr. Andres, a general surgeon, "for consideration for surgical excision of inflamed tissue." Id. at 66. Hall saw Dr. Andres on July 11, 2018. Id. at 77–79. Dr. Andres elected to refer Hall to a plastic surgeon for input on whether surgery would be a viable treatment option. Id. at 79. Dr. Andres noted that "[i]t would be a large defect that would not be able to be closed primarily and would require some type of flap or grafting." Id.

Dr. Smith arranged for Hall to be evaluated by an outside plastic surgeon at UVA on August 28, 2018. Id. at 74. The plastic surgeon who examined Hall, Dr. Benedetti, described Hall's scalp condition as "a very difficult to manage disease process that tends to be recalcitrant and difficult to completely eradicate." Id. at 72. He concluded that surgical intervention was

3

not the best option because Hall had not exhausted all non-surgical treatment options. Id. at 73. Additionally, since the surgical procedure would be a "complex undertaking," Dr. Benedetti recommended that surgery be "reserved as a last resort." Id. at 72; see also id. at 74 (noting that surgery "is not advised at this time" and that it would require a "massive excision and reconstruction likely in several stages"). Dr. Benedetti also recommended that Hall be evaluated by a dermatologist for medical management options and noted that Hall should "undergo at least 6 months of consistent medical therapy prior to consideration of more invasive options." Id. Based on the plastic surgeon's recommendations, Dr. Smith submitted a consultation request for Hall to be seen by a dermatologist. Id. at 70.

On October 16, 2018, Hall was examined by Dr. Emily D. Privette at Charlottesville Dermatology. Id. at 91–92. Dr. Privette noted that she suspected "follicular occlusion disorder with dissecting cellulitis of the scalp and hidradenitis given reports of boils elsewhere on the body." Id. at 1. She "recommended a trial of a different antibiotic course . . . for several months" before considering Humira or Accutane. Id. at 91–92. Dr. Privette noted that she would need to investigate the safety of taking either drug in light of Hall's preexisting diagnosis of Hepatitis C. Id. at 87. She requested that Hall return for a follow-up appointment in three months. Id.

Hall returned to Charlottesville Dermatology on January 16, 2019. Id. at 100–02. Dr. Privette noted that Hall's scalp condition was "much improved . . . , though very active." Id. at 101. She recommended that Hall continue taking the same antibiotics for three months, after which she would potentially refer him back to a plastic surgeon. Id. Dr. Privette also noted that she may prescribe Accutane "after discussing comorbidities." Id.

4

In February of 2019, Dr. Smith referred Hall to a urologist after a routine screening revealed an elevated prostate-specific antigen ("PSA") level. Id. at 106, 109. The urologist prescribed Oxybutynin and ordered additional lab work. Id. at 108. On April 26, 2019, Hall underwent a prostate biopsy. Id. at 144. He was subsequently diagnosed with prostate cancer, for which he underwent a prostatectomy in July of 2019. Id. at 146, 164.

In March of 2019, Dr. Smith arranged for Hall to be referred to a hepatologist to determine whether Hall's scalp condition could be safely treated with Humira or Accutane. Id. at 98. Hall was examined by a hepatologist with Augusta Medical Group on May 17, 2019. Id. at 131–34. The hepatologist's report did not specifically address whether Hall could take Humira or Accutane in light of his preexisting comorbidities and instead focused on treatment options for Hepatitis C. Id. Consequently, Hall "had to be referred back to the hepatologist for the necessary clearance, which occurred on January 10, 2020." Smith Aff. ¶ 13 (citing Med. R. 185). In the meantime, while Hall underwent treatment for prostate cancer, he remained on antibiotics for the scalp condition. Med. R. 174–75; see also Smith Aff. ¶¶ 12, 14.

On February 9, 2020, Dr. Smith submitted a consultation request for Hall to be seen by a dermatologist for a follow-up appointment. Med. R. 169. Prior to doing so, Dr. Smith spoke to Dr. Savola "at length" regarding the proposed course of treatment for Hall's scalp condition. Id. at 170. While arrangements were being made for Hall to see Dr. Savola, Dr. Smith continued to monitor and treat Hall. Smith Aff. ¶ 16 (citing Med. R. 186–90 & 192–93).

Hall was scheduled to see Dr. Savola on June 2, 2020. Id. ¶ 17. Due to the COVID-19 pandemic, Dr. Savola's office rescheduled the appointment for June 4, 2020, and arranged for it to occur telephonically, with photographs of Hall's scalp submitted in advance. Id. (citing

Med. R. 192–93). On June 4, 2020, prior to the appointment and without advance warning, Dr. Savola terminated her physician-patient relationship with Hall. Id. According to the medical records, Dr. Savola indicated that she was "not comfortable seeing him at this time." Med. R. 193.

On July 8, 2020, Dr. Smith submitted an expedited request for Hall to be referred to the dermatology department at UVA. Med. R. 195–96. Dr. Smith summarized Hall's condition and treatment as follows:

> 57 y/o man with severe dissecting cellulitis of the scalp. The majority of his scalp is covered with fluctuant, purulent abscesses with deep sinus tracks. Has been on extended antibiotics (months) with Clindamycin and Rifampin with no improvement. Seen by plastic surgery who recommended against surgery and recommended medical management. Likely needs combination of Accutane and Humira based on my phone call with local dermatologist. Absolutely needs specialty consult, preferably UVA dermatology.

Id. at 196.

At the time of Dr. Smith's July 16, 2020, affidavit, arrangements were still being made for Hall to be seen at UVA. Smith Aff. ¶ 18. Dr. Smith continued to manage Hall's scalp condition with topical and oral antibiotics. Id. ¶ 19. He also prescribed Naproxen for any associated discomfort. Id.

### C. Hall's Response in Opposition

On July 29, 2020, Hall filed a verified response in opposition to Dr. Smith's motion for summary judgment. Under the heading "Genuine Issues," Hall faults Dr. Smith for prescribing antibiotics instead of "what is actually needed to treat [the] serious scalp disease infection." Pl.'s Resp. Opp'n 4, ECF No. 21. Hall further alleges that Dr. Smith has "failed to seek other

6

options or alternatives to treat [his scalp] condition" and that there are "no other alternatives than corrective surgery."[2] Id. at 5, 12.

### D. Subsequent Filings

After responding to Dr. Smith's motion for summary judgment, Hall filed motions for preliminary injunctive relief, in which he requested expedited medical treatment for his scalp condition. Dr. Smith filed a response in opposition to the motions on September 18, 2020, along with a second affidavit and supplemental medical records.

The supplemental medical records indicate that Hall was examined by a dermatologist at UVA on August 31, 2020. Suppl. Med. R. 197–99, ECF No. 26-2. During the appointment, the dermatologist performed a full skin examination and discussed treatment options for Hall's scalp condition. The dermatologist recommended that Hall begin treatment with Humira but noted that "this is complicated by [Hall's] uncertain Hepatitis status" and that he would need to "consult with [Hall's] hepatologist." Id. at 198. The dermatologist also noted that surgery

---

[2] Hall's response also includes a number of additional claims that were not included in his verified complaint. See Pl.'s Resp. Opp'n 3 (referencing the Equal Protection Clause of the Fourteenth Amendment); id. at 5 (alleging that Dr. Smith forced him to live in general population following prostate surgery, even though he was still using a catheter); id. at 6 (alleging that Dr. Smith had not provided "any treatment" for his "liver nor cancer problems"; id. at 10 (couching his allegations about Dr. Smith's stopping his transfer to another facility as a retaliatory action in response to this lawsuit, rather than an Eighth Amendment deliberate indifference claim); id. (alleging that he was being held in restrictive housing, against his will, "under inhumane solitary conditions of confinement"). "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." S. Walk at Broadlands Homeowner's Ass'n v. Openband at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013). The rule is no different for pro se plaintiffs. See Chaney v. United States, 658 F. App'x 984, 988 (11th Cir. 2016) (emphasizing that a pro se litigant "must follow procedure rules" and therefore "cannot raise new claims in his brief opposing summary judgment"); Sarno v. Wilson, No. 1:17-cv-00953, 2018 WL 3638079, at *3 n.2 (E.D. Va. July 27, 2018) (noting that "it is well accepted that a plaintiff, even one proceeding pro se, cannot amend his complaint by asserting new claims in an opposition brief to a motion for summary judgment") (citations omitted). Accordingly, the court declines to consider the new claims presented in response to the motion for summary judgment. Instead, the court will focus its attention on the single "claim" asserted in Hall's verified complaint—namely, that Dr. Smith exhibited "'deliberate indifference' . . . to his serious medical need of a scalp disease infection." Compl. 2. If Hall wishes to pursue additional claims, he must file a new complaint.

would be a "final treatment option." Id. In the meantime, the dermatologist provided prescriptions for clobetasol and clindamycin lotion. Id. at 198–99.

On September 1, 2020, Dr. Smith called and spoke to the dermatologist after receiving a copy of the examination report. Smith 2d Aff. ¶ 3, ECF No. 26-1. Following the call, Dr. Smith wrote a prescription for Humira, which had to be approved by Jesus M. Lanes, Jr., M.D., the National Health Services Medical Director for the medical provider at ACC. Id. Dr. Lanes initially denied the request because Hall's skin condition is not an FDA-approved use for Humira. Id. ¶ 4. However, after Dr. Smith spoke with Dr. Lanes and provided additional information regarding Hall's course of treatment, Dr. Lanes approved the prescription on a month-to-month basis. Id.

On October 8, 2020, the court denied Hall's motions for preliminary injunctive relief. ECF No. 27. He has since been released from incarceration. ECF No. 28. Hall now resides in Sumpter, South Carolina. Id.

## II. Standard of Review

The case is presently before the court on Dr. Smith's motion for summary judgment. The court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

8

When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Tolan v. Cotton, 572 U.S. 650, 657 (2014) (per curiam). To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. Anderson, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks and citation omitted).

### III. Discussion

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments."[3] U.S. Const. amend. VIII. "Under the Eighth Amendment, prisoners have the right to receive adequate medical care while incarcerated." Depaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018) (citing Scinto v. Stansberry, 841 F.3d 219, 236 (4th Cir. 2016)). An Eighth Amendment violation occurs "[w]hen a prison official demonstrates 'deliberate indifference' to an inmate's serious medical needs. Id. (citations omitted); see also Gordon v. Schilling, 937 F.3d 348, 356 (4th Cir. 2019) ("It is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.") (internal quotation marks and citations omitted).

A claim for deliberate indifference has two components. Heyer v. United States Bureau of Prisons, 849 F.3d 202, 209 (4th Cir. 2017). "The plaintiff must show that he had serious

---

[3] This proscription is applicable to the States through the Fourteenth Amendment. Gordon v. Schilling, 937 F.3d 348, 356 n.11 (4th Cir. 2019).

9

medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." Id. In this case, Dr. Smith does not dispute that Hall's scalp condition qualifies as objectively serious. Instead, Dr. Smith argues that Hall has not set forth any evidence to establish that he acted with deliberate indifference to Hall's medical needs and that the undisputed medical records show that he was not deliberately indifferent. The court agrees with Dr. Smith.

"An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). This is an "exacting standard," which requires more than mere negligence or medical malpractice. Id. (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). The treatment provided by a health care provider "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Thus, mere disagreements between an inmate and a physician regarding the proper course of treatment "fall short of showing deliberate indifference." Jackson, 775 F.3d at 178. Likewise, "it is not enough that an official should have known of a risk" to an inmate's health. Id. Rather, the official "must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." Id. "The subjective component therefore sets a particularly high bar to recovery." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Applying these standards, the court concludes that Dr. Smith is entitled to summary judgment. First, there is no evidence from which a reasonable jury could find that Dr. Smith

10

intentionally denied medical treatment for Hall's scalp condition. See Formica v. Aylor, 739 F. App'x 745, 754 (4th Cir. 2018) (noting that the "necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally denying or delaying medical care, or intentionally interfering with prescribed medical care) (emphasis omitted) (citing Estelle, 429 U.S. at 104–05). The medical records establish that Dr. Smith personally assessed and treated Hall's scalp condition on multiple occasions and that he arranged for Hall to be evaluated by several outside specialists, including dermatologists, a hepatologist, and a plastic surgeon. Although Hall clearly disagrees with the course of antibiotic treatment prescribed by Dr. Smith and the dermatologists, such disagreement is insufficient to support a claim of deliberate indifference. Jackson, 775 F.3d at 178.

Second, there is no evidence from which a reasonable jury could find that Dr. Smith intentionally interfered with or delayed medical treatment recommended or prescribed by the outside specialists. Although Hall personally believes that corrective surgery is the only solution to the scalp problem, surgery was not ordered or recommended by any of the outside specialists who examined Hall. Indeed, the plastic surgeon expressly advised against surgery, describing it as a "last resort." Med. R. 72. Likewise, the dermatologist who most recently examined Hall described surgery as a "final treatment option." Suppl. Med. R. 198. Under these circumstances, no reasonable juror could find that the failure to arrange for surgical treatment constitutes deliberate indifference on the part of Dr. Smith.

The same is true for the delay in treating Hall's scalp condition with Humira. The medical records reveal that at least two dermatologists were hesitant to prescribe Humira or

11

Accutane in light of Hall's preexisting diagnosis of Hepatitis C. Rather than depriving Hall of this alternative course of treatment, Dr. Smith arranged for Hall to see a hepatologist on two occasions and specifically requested that the hepatologist "comment on [the] safety of using either of those medications." Med. R. 134. During the intervening period between the hepatology appointments, Hall underwent treatment for prostate cancer and remained on antibiotics for his scalp condition. After Dr. Smith received the requested information from the hepatologist, Dr. Smith arranged for Hall to have a follow-up appointment with Dr. Savola. When Dr. Savola elected to terminate her physician-patient relationship with Hall immediately prior to the appointment, Dr. Smith referred Hall to a dermatologist at UVA. After conferring with that dermatologist, Dr. Smith prescribed Humira for Hall and then provided additional information necessary for the prescription to be approved by the National Health Services Medical Director. In the meantime, Dr. Smith continued to treat Hall's scalp condition and associated discomfort with antibiotics and Naproxen. On this record, no reasonable jury could find that Dr. Smith intentionally delayed treatment with Humira or that he knowingly disregarded an excessive risk to Hall's health or safety.

Finally, no reasonable jury could find that Dr. Smith acted with deliberate indifference by issuing a medical hold that prevented Hall from transferring to a different facility.[4] See Shields v. Ill. Dep't of Corr., 746 F.3d 782, 788 (7th Cir. 2014) (explaining that "[a] medical

---

[4] As noted supra note 2, Hall's verified complaint did not contain a retaliation claim based on the issuance of the medical hold. In any event, Hall has not offered any evidence, other than mere speculation, to suggest that Dr. Smith had a retaliatory motive in placing the medical hold. Thus, even if his verified complaint could be construed as raising such a claim, it would fail on its merits. See Adams v. Rice, 40 F.3d 72, 74–75 (4th Cir. 1994) (holding that the plaintiff's conclusory allegations of retaliation were insufficient to state a claim against prison officials).

hold prevents a prisoner from being moved to a different prison during medical treatment, to ensure continuity of care"). Hall states that the medical hold was reportedly "due to offsite schedule medical appointment pending." Compl. 4. At the time of the alleged medical hold, Dr. Smith had undertaken efforts to ensure that Hall's scalp condition could be safely treated with Humira in light of preexisting comorbidities. Dr. Smith had received the requested clearance from the hepatologist, and he had recently initiated a request for Hall to be seen for a follow-up appointment with a dermatologist in order to proceed with this course of treatment. Under these circumstances, no reasonable jury could find that Dr. Smith violated the Eighth Amendment by issuing a medical hold. Although Hall personally believes that he would have received better medical treatment at a different facility, such "unsupported speculation" is insufficient to establish deliberate indifference. Danser v. Stansberry, 772 F.3d 340, 348 n.10 (4th Cir. 2014).

For all of these reasons, the court concludes that Dr. Smith is entitled to summary judgment. In reaching this conclusion, the court recognizes that Hall's severe scalp condition is painful and unpleasant and that his symptoms were not completely eradicated by the various courses of treatment provided during his period of incarceration. Nonetheless, Hall's "disagreement with his treatment regimen and any unsuccessful treatment are insufficient to establish deliberate indifference." Baker v. Armstrong, 813 F. App'x 928, 930 (5th Cir. 2020). As another judge recently explained in a related case filed by Hall, "[t]his principle is particularly important here, where various statements in the medical records suggest that this particular disease is not easily treated," and "Hall also has comorbidities which have complicated his treatment." Hall v. Dameron, No. 7:19-cv-00869, 2020 WL 4810126, at *6

13

(W.D. Va. Aug. 18, 2020) (Moon, J.). Moreover, the medical records reflect repeated efforts by Dr. Smith and outside specialists to find a treatment that would work for Hall in light of those comorbidities, and the court is convinced that no reasonable jury could find that Dr. Smith's actions exhibited deliberate indifference.

## IV. Conclusion

For these reasons, Dr. Smith's motion for summary judgment, ECF No. 17, is **GRANTED**. An appropriate Order will be entered.

Entered: June 8, 2021

Michael F. Urbanski
Chief United States District Judge